## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **RICARDO ORTIZ PEREZ,**<br>**JOHANNA JEREZ REYES (WIFE) AND THE**<br>**CONJUGAL PARTNERSHIP BETWEEN THEM;**<br>**NATALIE ORTIZ JEREZ (DAUGHTER)**<br>**REPRESENTED BY HER FATHER RICARDO ORTIZ**<br>**PEREZ AND JOHANNA JEREZ REYES;**<br><br>PLAINTIFFS<br><br>V.<br><br>**SIG SAUER, INC.;**<br>**INSURANCE COMPANY X.**<br><br>DEFENDANTS | CIVIL ACTION: -<br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT AND DEMAND FOR JURY TRIAL

**TO THE HONORABLE COURT:**

**COME NOW,** Plaintiffs, Ricardo Ortiz Perez, Johanna Jerez Perez (wife), and Natalie Ortiz Jerez (daughter)**,** through their undersigned counsels, and respectfully state, allege and pray:

### I.   NATURE OF THE ACTION JURISDICTION AND VENUE

1.      This is an action to recover personal damages, which the defendants inflicted upon the plaintiffs as a result of their negligent acts and/or omissions.

2.      The Court has federal question jurisdiction over the case. It involves a claim under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq. The Court has supplemental jurisdiction over Ricardo' state law claims pursuant to 28 U.S.C. § 1367(a) because they are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution and this Honorable Court has jurisdiction over the parties and the subject matter of this litigation under and pursuant to Section 1332 of Title 28 of the United States Code, 28 U.S.C. §1332, inasmuch as there is complete diversity of citizenship between the Plaintiffs and the Defendants and the amount in controversy, exclusive of costs and interest, exceeds the amount of SEVENTY-FIVE

1

THOUSAND DOLLARS ($75,000.00). As well the applicable statute of limitations for the present civil action.

3.    This action seeks actual, compensatory, punitive damages, and equitable relief, relating to defendant SIG Sauer, Inc.'s negligence, defective manufacturing and/or design, breach of warranties and unfair and deceptive marketing practices regarding a semi-automatic gun.

4.    Pursuant to pursuant to 28 U.S.C. §1367, this Court has supplemental jurisdiction over state tort claims under Articles 1536, 1538, 31 LPRA §§ 10801, 10803 and Articles 154-154, 31 LPRA sec. 10807 et seq. of the Puerto Rico Civil Code, because they are related to the federal claim and form part of the same case or controversy under Article III of the United States Constitution.

5.    Venue is proper in this Court pursuant to Section 1391 of Title 28 of the United States Code, 28 U.S.C. §1391, because the claims asserted arose in this judicial district.

6.    Plaintiffs request a jury trial for all issues so triable.

7.    The events that triggered this action occurred on December 23rd, 2022.

8.    Plaintiff acknowledges that on August 3rd, 2025, he recognized and confirmed that the Sig Sauer P320 model had been banned from diverse, States, Federal and State Agencies due to defects and critical discharges such as his.

9.    Also, he reviewed a expert report in which it was determined that the Sig Sauer P320 model has presented diverse design defects that prompts its malfunction causing an uncommanded discharge with or without touching the trigger.  Therefore, the statute of limitations to file the present complaint is in a timely manner.

## II. THE PARTIES

10.    Co-Plaintiff, Ricardo Ortiz Perez (herein referred to as "Ricardo"), is of legal age, married to Johanna Jerez Reyes, Police officer and resident of Corozal (herein referred to as "Ricardo"), father of 1 daughter, with domicile and residence in a house located in Street Number 568, Kilometer 25.8 Interior, Padilla Ward, Corozal, Puerto Rico 00973. Ricardo is 43 years old, police

officer, who has worked in the police bureau for more than 20 years, he is allowed to carry weapons, concealed or unconcealed, and has substantial firearms experience. As alleged later herein, he has suffered severe, permanent physical injury and disfigurement as a direct and proximate result of the negligence and breach of warranties and deceptive marketing practices of SIG.

11.     Co-Plaintiff, Johanna Jerez Reyes is married to Ricardo and resides with him, forming a Conjugal Partnership that is also a co-plaintiff.

12.     Co-Plaintiffs, Natalie Ortiz Jerez, daughter of Ricardo and Johanna, who reside with them, and is 15 years old and who is minor and hereby represented by his father and mother.

13.     Defendant, Sig Sauer, Inc. is a foreign profit corporation with the principal office address of 72 Pease Boulevard, Newington, New Hampshire 03801. SIG SAUER, Inc. (further referred to as SIG) is a Delaware corporation that designs, assemble and manufactures firearms for military and commercial (law enforcement and civilians) markets throughout the United States, and internationally. It markets and sells its products directly and through dealers. SIG was formerly known as SIGARMS, Inc. and changed its name to SIG Sauer, Inc. in October 2007.

14.     Co-Defendant, fictitious Insurance Company X whose identity is presently unknown, who upon information or belief is an insurance company organized and existing, who insured the defendant and is jointly and severally responsible for the damages claimed herein.

### III. FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

15.     On 2018, Ricardo was assigned by the Puerto Rico Police Bureau (further on referred as PRPB) a 9mm caliber SIG Sauer P320 Pistol (Serial Number 58H037140) on his police officer job.

16.     On December 23rd, 2022, the day of his birthday, while fixing with his left hand his Safariland Holster with the pistol (P320) inside his waistband, it suddenly discharged inside the holster and the casing remained inside the pistol, without touching the trigger. In the weapons industry, this type of discharge is typically referred to as an inadvertent or unintended discharge in which the weapon fires without a trigger pull. See, e.g., O'Neal v. Remington Arms Co., LLC, 817 F.3d 1055,

1060 (8th Cir. 2015) (referring to "inadvertent discharge" of weapon "without the trigger being pulled").

17.    As soon as Ricardo touched the inside holster with his right hand in his waistband, the P320 fired without the trigger being touched or pulled and the bullet struck him in his abdomen cutting flesh through his insides and pushing into the rear part of his left thigh.

18.    At that moment Ricardo was alone inside his private vehicle preparing to go out to buy some perfumes.

19.    Ricardo's pistol, holster, a magazine and casing were seized by the PRPB, the same day of the incident. Not the bullet because at his point in time it remains in his body.

20.    The discharge caused several injuries, one of them with entry perforations of the bullet on the abdomen, causing injuries to Ricardos's inner parts and flesh and tissue, left horrendous scars and impairment of his extremities, among other damages and injuries. Ricardo went through several medical treatments' and is pending the extraction of the bullet.

21.    The discharged bullet left a gaping wound in his abdomen, that caused nerve damage, left a horrendous scar and the casing remained inside the pistol which was inside the holster and another bullet in place ready to deploy (fire). Ricardo also has PTSD caused by the traumatic event (not medically diagnosed).

22.    The police investigation reflected and stated, that the firearm went off "when trying to remove the pistol which was inside the holster in his waist." as stated by plaintiff Ricardo.

23.    Ricardo removed the pistol and placed it in the passenger seat and called his wife. Then he proceeded driving to the nearest hospital in Bayamon.

24.    Ricardos wife and other police officers came swiftly to the hospital.

25.    The incident has resulted in physical harm and related trauma to Ricardo, was administered ER attention, he was hospitalized, moving in a wheelchair, had to use afterwards crutches to walk, given pain-killing narcotics to deal with the injury and function on a day-to-day

basis. Ricardo was surgically intervened due to the injuries. He was submitted to surgery to treat the wounds.

26.    He continues to take a significant amount of sleep medications which he takes daily and frequently wakes up sweating with night terrors about the incident and the wound itself. He has suffered numbness, maceration of whole leg tissue and muscle, and remnants of the injuries due to the discharged bullet, was practically impeded from moving among his house for various weeks, now he is unable to perform sports activities that he usually did, normal daily activities, and many other things that he enjoyed prior to the incident.

27.    Ricardo has also suffered mental and emotional damage because of the incident, being frustrated and depressed, with continuous anguish and distress as a result of the pain from his physical injuries.

28.    Ricardos' P320 should not have discharged without the trigger being pulled, holstered or un-holstered.

29.    Defendant, as manufacturer of the P320 Pistol, is responsible for the defective performance of the Pistol and for the damage that it caused upon Plaintiff.

30.    Before February 2018 (when the PRPB acquired the P320), Defendant had prior knowledge of Model P320 Pistol's defects, and that it posed a hazardous risk to users, knowing of several prior incidents from complaints, and claims about problems with the trigger assembly of the P320. Yet, Defendant ignored and disregarded all prior incidents, failing to take corrective measures, being liable for punitive damages, including for unfair and deceptive trade practices in their marketing of the weapon, as further described, for negligent and intentional infliction of emotional distress in view of Sig's misleading representations about the safety of the weapon.

## COUNT I

## RESPONSIBILITY PURSUANT TO ARTICLES 1542, 1543 AND 1544, OF PUERTO RICO CIVIL CODE.

31.     Ricardo readopts and re-alleges all the preceding paragraphs of this pleading as if fully set forth herein.

32.     The SIG P320 is a consumer product as defined in the Puerto Rico Civil Code.

33.     Plaintiff Ricardo is a consumer as defined in the Puerto Rico Civil Code.

34.     At all relevant times, SIG was a supplier and warrantor of the P320 pistol, as defined in the Puerto Rico Civil Code.

35.     SIG owed Ricardo the duty to exercise reasonable care in designing and manufacturing the P320 weapon before selling or exchanging with the PRPB the gun and placing it into the stream of commerce, so as to prevent the gun from discharging without pulling the trigger.

36.     At all relevant times, SIG owed Ricardo the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing inside or outside a holster, where the trigger cannot be pulled, before selling the gun and placing it into the stream of commerce.

37.     At all relevant times, SIG owed a duty to unambiguously warn consumers and/or intended users of the P320, including Ricardo, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use.

38.     Upon information and belief, SIG knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other numerous sources of information to be developed in discovery, long before one of its P320s shot Ricardo in December 23rd, 2022.

39.    SIG breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts: i. By failing to use due care in designing and manufacturing the P320's firing and striker assembly so as to prevent un-commanded discharges; ii. By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, so as to prevent un-commanded discharges; iii. By failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products; iv. By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above; v. By negligently failing to unambiguously warn purchasers and end users of the gun, including Ricardo, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care; vi. By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun; vii. By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges: viii. Other negligent acts and omissions to be developed in the course of discovery.

40.    SIG knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including sudden death.

41.    The gun's defective condition was not visible, and Ricardo was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

42.    SIG' negligence as alleged in this Count directly and proximately caused December 23rd, 2022, un-commanded discharge and Ricardo' injuries resulting from the accident.

43.    As a direct and proximate result of the negligence set forth in this Count, Ricardo suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earning capacity, as well as medical, nursing and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature, and Ricardo will suffer such losses and impairments in the future. Also, a PTSD condition for life.

44.    It is stated specifically in Article 1542 of the Puerto Rico Civil Code that people that sell a product in commerce which by its design or manufacturing is unreasonably dangerous, will be liable for the damage that such a product may cause even if no intention or negligence is present.

45.    It is stated specifically in Article 1543 of the Puerto Rico Civil Code, that a product is unreasonably dangerous by its manufacturing, when the product deviates from its design or when the product does not comply with the security expectations that the ordinary consumer that uses such product for its intended purpose and use for it was obtained or an anticipated reasonable purpose or use.

46.    The gun's defective condition was latent, and Ricardo was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same. SIG's negligence as alleged in this Count directly and proximately caused December 23rd, 2022, accidental discharge and Ricardo's injuries resulting from the accident. As a direct and proximate result of the negligence set forth in this Count, Ricardo suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, nursing, attendant care and life care expenses for his care and treatment,

and an impairment of his right extremity for the rest of his life. These injuries are either permanent or continuing in their nature and Ricardo will suffer such losses and impairments in the future.

47.    For the Defective product made defendants that caused plaintiff Ricardo to suffer damages, defendant is liable and is responsible, *in solido*, in a sum not less than FOUR MILLION DOLLARS ($4,000,000.00) in compensatory damages, plus another amount in punitive damages to be determined by the Jury based on the intentional and willful omissions after having privity of knowledge.

## COUNT II

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

48.    Ricardo readopts and re-alleges all the preceding paragraphs of this pleading as if fully set forth herein.

49.    At all relevant times, SIG was in the business of marketing, selling, and distributing weapons, including the gun causing Ricardo' injuries.

50.    SIG knew of the ordinary purposes for which the gun was intended and impliedly warranted it to be of merchantable quality, safe, and fit for such purposes (which included being "vibrated" and handled while situated inside or outside a holster) and all other reasonably foreseeable uses.

51.    At all relevant times, Ricardo used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment and implied warranty of SIG. SIG breached the above-referenced implied warranties as to the gun because, at the time it left SIG's possession, it was not of merchantable quality and was unreasonably dangerous and unfit for the ordinary and reasonably foreseeable purposes for which it was intended and its reasonably foreseeable misuses by virtue of: i. Failing to use due care in designing and manufacturing the P320's internal components, including its sear-striker connection, and by omitting a mechanical disconnect switch, so as to prevent

un-commanded discharges; ii. Failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products; iii. Failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally as described above; iv. Negligently failing to unambiguously warn purchasers and end users of the gun, including Ricardo, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care; v. Failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun; and vi. Negligently failing to place a warning about the danger of mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges.

52.    Ricardo, as the end user of the gun, was a person who would foreseeably be injured by SIG's breach of the implied warranty referenced in this Count and SIG's breach of the warranty of merchantability as alleged herein, which breaches directly and proximately caused the accident on December 23rd, 2022, and Ricardo' claimed injuries.

53.    As a direct and proximate result of the breaches set forth in this Count, Ricardo suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, PTSD, physical deformity and handicap and embarrassment associated with the same, loss of earning capacity, as well as medical, nursing, and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature, and Ricardo will suffer such losses and impairments in the future.

## COUNT III

## BREACH OF EXPRESS WARRANTY

54.    Ricardo readopts and re-alleges all the preceding paragraphs of this Complaint as if fully set forth herein.

55.    The defendant is liable for the breach of an expressed warranty it made regarding its Pistol Model P320.

56.    SIG expressly warranted that the P320 would not fire unless the trigger was pulled.

57.    At all times material hereto, SIG was in the business of marketing, selling, and distributing weapons, including the gun causing Ricardo' injuries. Upon information and belief, SIG knew, or had reason to know, that the gun would be situated in holsters that would need to be removed from end users' waistbands, manipulated when inside the Safariland inside holster, at the time SIG sold the gun, and that the purchaser was in fact relying on SIG's skill, judgment, and implied warranty of the gun's fitness for that particular purpose.

58.    At all relevant times, Ricardo used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment and implied warranty of SIG in using and handling the gun and its SIG-issued Safariland holster.

59.    SIG breached the above-referenced express warranty as to the gun in that it fired without a trigger pull, and was unreasonably dangerous at the time it left SIG's possession by virtue of: i. Failing to use due care in designing, manufacturing, sub-contracting fabrication of parts, and or/ assembling the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, so as to prevent accidental discharges; ii. Failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products; iii. Failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally as described above; iv. Negligently failing to unambiguously and conspicuously warn purchasers and end users of the gun's issues, including

11

Ricardo, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care; v. Failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun; vi. Negligently failing to place a warning about the danger of mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges; and vii. Expressly warranting that the gun would not fire unless the trigger was pulled. As a direct and proximate result of the breaches set forth in this Count, Ricardo suffered severe physical injury, mental anguish, PTSD condition, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, nursing, and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature, and Ricardo will suffer such losses and impairments in the future.

## COUNT IV
## INFLICTION OF EMOTIONAL DISTRESS

60.    Ricardo readopts and re-alleges all the preceding paragraphs of this Complaint as if fully set forth herein.

61.    For more than three years, if not longer, SIG had knowledge of several claims and judicial complaints about serious defects in the commercial version of the P320 gun, for before Ricardo was shot on December 23rd, 2022. As stated in the body of this complaint it is clear to say that SIG had plenty of knowledge of the situations, problems and claims directly related to the P320's problem of firing without a trigger pulled in or outside the Safariland holster.

62.     The defendant acted with total reckless disregard, when after knowing of all the claims about alleged defects in the Model P320, SIG ignored these situations without taking corrective measures to avoid these types of accidents of self-discharges without pulling the trigger of Model Pistol P320, which all cause emotional distress to Plaintiff and his family.

63.     Despite having such knowledge, it failed to issue a mandatory recall of the gun despite the ability to do so, which would have prevented the severe injury to Ricardo.

64.     Had SIG acted responsibly and repaired the defects in the commercial version of the P320 before and on time, Ricardo never would have been shot. The round discharged from his weapon easily could have taken his life, that of any bystander near him at the time of discharge, or his family members.

65.     SIG willfully acted and failed to act, so as to endanger the safety and lives of end users of its products because it sought to save millions in repair costs, by failing to institute a mandatory recall as it had done for other defective SIG weapons, choosing instead to implement a woefully inadequate "voluntary upgrade."

66.     SIG's conduct in this matter as described herein was extreme and outrageous, such as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community.

67.     Through SIG's extreme and outrageous conduct, SIG intentionally or recklessly caused Ricardo severe emotional distress, as well as severe and permanent physical injury.

68.     As a direct and proximate result of the breaches set forth in this Count, Ricardo suffered severe mental anguish, as a result of his injuries, PTSD condition, inconvenience, loss of the capacity for the enjoyment of life, physical deformity, impairment of the affected extremity, and embarrassment associated with the same.   These injuries are either permanent or continuing in their nature, and Ricardo will keep suffering such losses and/or impairments in the future.

69.    For the Infliction of Emotional Distress suffered by plaintiff Ricardo, defendant is liable and responsible, *in solido*, in a sum not less than FIVE HUNDRED THOUSAND DOLLARS ($500,000.00).

## COUNT V
## PUNITIVE DAMAGES

70.    Defendant is liable for punitive damages pursuant to Articles 154-154, 31 LPRA sec. 10807 et seq. of the Puerto Rico Civil Code in an amount to be determined by the Jury.

71.    There had been many prior incidents of unintended discharges involving SIG weapons that were known by SIG prior to the accident in the instant case, that allegedly have discharged without the trigger being pulled, or simply while being handled, accidentally dropped, or while being holstered. Also, some cases have been settled and in other situations Plaintiffs have prevailed in their lawsuits against Sig Sauer, Inc.

72.    Despite knowledge of safety defects with the P320 as early as 2016, however, SIG has negligently and recklessly failed to correct issues with the P320 Pistol, or issue a mandatory recall of the commercial version, like the one used by Plaintiff as police officer, SIG, upon information and belief, fixed defects in the prototype military version of the P320, installing a lighter trigger and internal modifications to prevent unintended discharges, as early as 2016, while competing to obtain a contract worth more than $580,000,000 with the United States Army. It successfully obtained the latter in January 2017. Despite knowledge of safety defects with the P320 as early as 2016, however, SIG has negligently and recklessly failed to issue a mandatory recall of the commercial version, owned by civilians and law enforcement agencies all over the country. It successfully obtained the latter in January 2017. Despite knowledge of safety defects with the P320 as early as 2016, however, SIG has negligently and recklessly failed to issue a mandatory recall of the commercial version, owned by civilians and law enforcement agencies all over the country.

14

73.    SIG SAUER, upon information and belief, fixed these types of defects in the prototype military version of the model P320, installing a lighter trigger and internal modifications to prevent unintended discharges, as early as 2016, while competing to obtain a contract worth more than $580,000,000 with the United States Army.

74.    A federal judge has upheld a landmark jury award in a product liability case against New Hampshire-based gunmaker Sig Sauer. The lawsuit involves a Georgia man who was shot without allegedly pulling the trigger of his own P320 pistol, a popular Sig Sauer model that is also at the center of dozens of other lawsuits claiming it has a design flaw that leaves it prone to unintentional discharges.

75.    Last June, a jury in Georgia awarded Robert Lang $2.35 million in damages after he suffered a serious gunshot wound to his thigh in 2018 while removing the gun from its holster. The payout marked the first time the firearms manufacturer, based in Newington, had been found negligent by a jury for a P320 unintentionally discharging. Sig Sauer appealed the verdict, arguing that the jury was presented with evidence that should have been blocked from the two-week trial, including testimony by two gunsmiths. Last week, a federal judge dismissed the gunmaker's request for a new trial, however, along with an appeal to reduce the amount of damages for pain and suffering owed to Lang to $500,000. Lawyers for Lang praised the ruling, saying in a statement that the "jury heard and understood the evidence." "The only ones not listening, unfortunately, are those at Sig Sauer who refuse to change the P320's design before more law enforcement officers and law-abiding gun owners are injured or killed," said Robert Zimmerman, an attorney who represented Lang. The case centered on the pistol's lack of an external safety — described as a "tabbed" trigger in court documents — and whether the company adequately discloses the risk of unintentional discharges the gun allegedly poses.

76. In Lang's case, the judge wrote that "the parties agree that something caused the trigger to pull; however, they dispute what caused the trigger to pull."

77. Last November, a jury in Philadelphia awarded a man $11 million following a similar incident in which a P320 fired without an intentional trigger pull.

78. Sig Sauer's P320 pistol is one of the country's most popular guns, with more than 2.5 million sold, according to court records.

79. Sig SAUER made false representations to users regarding its Model P320. Years before the incident occurred in December 23rd, 2022, through and including the date of Ricardo' assignment of the pistol, SIG expressly warranted that the weapon could not fire without a trigger pull. The safety propaganda indicates that:

> **"SAFETY WITHOUT COMPROMISE**
> **We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P230 won't fire unless you want it to."**

80. In additional marketing material, under the heading "Striker Safety," SIG further states: the Striker Safety "[p]revents the striker from being released unless the trigger is pulled":

> **"STRIKER SAFETY: Prevents the striker from releasing unless the trigger is pulled."**

81. At the same time, SIG SAUER contradictorily warned in the original owner's manual for the P320, on page 25, that the weapon could fire if dropped without the trigger being pulled. Specifically, that it could fire if a round were chambered, i.e., inside the firing chamber of the weapon's slide when incurring an impact from the ground:

> **"WARNING – DROPPED PISTOL**
> **If dropped, the pistol may fire. Keep the chamber empty unless actually firing.**
> **ANY FIREARM MAY FIRE IF DROPPED."**

82. Despite this warranty, which SIG has made for the last several years to the present day, the weapon fired without the trigger being pulled.

83. Despite this warning, SIG expressly warranted not just that the P320 could not fire without a trigger pull, but that it **could not fire if dropped**, in marketing documents regarding the P320. The company was therefore stating two opposite things about the safety features of the P320, or lack thereof, at the same time

> *"SAFETY WITHOUT COMPROMISE.*
>
> *Safety ins't negotiable. The P230 maximizes peace of mind with a robust safety system. Never again will you need to pull the trigger to disassemble your pistol. And, while available as an option, you won't need a tabbed trigger safety for your gun to be dropped safe."*

84. A striker-fired pistol is different from the traditional "hammer-fired" pistol. It contains no external hammer to be pulled back by the user to cock the gun, such as the subject pistol assigned to Ricardo.

85. Rather, an internal "striker" is held back under spring pressure inside the gun like a crossbow. Once the slide is racked backward, the weapon is internally cocked and ready to fire and in "condition red" or "duty ready" condition. The striker is now under significant spring tension to move forward to impact the round's primer to fire the bullet and is held back only by the weapon's sear.

86. SIG's advertising regarding the P320 has alarmed and worried the law-enforcement lineage of their firearms and focuses on highlighting the military/police usage, the modularity, the safety, and the functionality to everyone.

87. In the marketing materials of the company, SIG advertised that the P320 would function in a safe manner. These representations contained within SIG's advertisements, packaging, package inserts and website, and they were also delivered to retailers in the form of marketing materials and specifications which were reprinted verbatim and made available to consumers.

88.    The advertising and continued claims of safety, knowingly to be untrue, led the Puerto Rico Police Bureau to acquire and assign to Ricardo and other agents the P320 without knowledge of its dangers.

89.    Since the condition manifested, SIG had a duty to disclose that the P320 had a substantial dangerous safety defect.

90.    Specifically, according to the information and belief, the mass and weight of the P320 trigger was far too large and heavy, rendering the weapon susceptible of inertia-based discharges. In addition, it lacked a mechanical disconnect device within the weapon (which has since been added for purchasers who ask SIG to install one), possessed an inadequate sear, and any external safety or tabbed trigger safety.

91.    On August 4, 2017, a Stamford, Connecticut, SWAT officer sued SIG in United States District Court for the District of Connecticut for damages relating to a drop fire that shot him in the knee when his holstered P320 fell from a distance of less than three feet and fired. The Stamford discharge resulted in a flood of negative national media publicity and attention regarding the safety of the P320, including television and the internet. Four days later, SIG issued a press release stating that the P320 could fire without a trigger pull under certain conditions, including vibration, but "reaffirmed" the safety of the P320 to all end users:

> *"All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to not work as designed. This language is common to owner's manuals of major handgun manufacturers."*
> *SIG SAUER PRESS RELEASE. Ex. II*

92.    SIG's claim was inaccurate and intentionally misleading because its new warnings regarding the capability of the P320 to fire without a trigger pull, upon "shock" or "vibration," were not "common to owner's manuals of major handgun manufacturers.".

93.    When in 2018 SIG shipped approximately 18,000 P320s to the Puerto Rico Police Bureau, through a private intermediary, where Ricardo was employed, it knew, or should have known, that the weapon was defective and unreasonably dangerous for its ordinary uses, intended uses, and all other foreseeable uses and accidental discharges that could occur in the ordinary course of using the weapon.

94.    Before it shipped these weapons, it was aware of accidental discharges of the P320 weapon, and other SIG pistols, many of which pre-dated and post-dated, delivery in 2018 to the Puerto Rico Police Bureau.

95.    It is known that the PRPB (signed by Lieutenant Jaime Cosme Oliver) in a document dated March 8th, 2024, indicated that during 2020 until the beginning of 2024 there were 68 critical discharge incidents related to the Sig-Sauer P320.

96.    It is known that in July 2025 a website video was divulged informing that an Airforce Sargeant (Terry Holmes) was killed by his M18 (the military version of the P320) while holstered when he put it in the table in front of him. This video has been viewed by 56,000 users of the platform. The Airforce office investigations has initiated a full investigation of the incident. (The Washinton Post). The U.S. Airforce Global Strike Command issued a memo banning the use of the Sig Sauer (Date: July 21st, 2025).

97.    It is known that the Chicago Police department has banned the use and acquisition of the P320 for their police officers.

98.    It is known that the ICE Federal Agency has banned the use, training and acquisition of the P320 for their agents and officers and promoted the acquisition of the Glock 19 as a replacement weapon.  (Date: July 9th, 2025)

99.    It is known that the Federal Bureau of Investigations (FBI) has banned the use, training and acquisition of the P320 for their agents.  (Date: August 30th, 2024)

100.    It is known that the Puerto Rico Government has initiated a formal investigation requested by Legislator Ricardo Torres, due to the imminent danger related to P320 pistols announced and declared by Federal Agencies, Government Dependencies, Police Bureaus and The United States State Department, to pause the use and acquisition of this specific pistol (Sig-Sauer P320).  (Date: July 23rd, 2025)

101.    The Legislator has requested among other things that an inventory of the P320 the PRPB has assigned to officers throughout the island or are in stored in custody; avoid the use implementing federal protocol; implement an inspection process and technical evaluation, including ballistics experts; and consider safe measures to warrant the operational use of related pistols.

102.    It is known that in early 2016, while competing for a $580,000,000 contract to supply the United States Army with a new service pistol in 2016, SIG's prototype P320s exhibited 200 malfunctions or more during Army testing. These defects included failure to eject spent casings, firing upon impact with the ground, and not firing. In or around April 2016, the Department of Defense (DOD) notified SIG of many malfunctions with the P320. It demanded that SIG fix all design problems associated with the P320.

103.    In early 2016, SIG was also warned by a Florida police department, and others, that the P320 was capable of firing without a trigger pull.

104.    SIG decided not to tell and did not tell the public about the 2016 DOD and other law enforcement agency warnings about defects with the P320.

105.    As early as 2016, if not years before, members of SIG's management and design teams began investigating defective discharge events.

106.    These investigations involved SIG employees visiting local law enforcement agencies reporting defective discharge events and taking the weapons to New Hampshire for in-house "testing."

These tests typically consisted of firing rounds through the weapon at issue and declaring it to be fine. In each case, this in-house testing destroyed the integrity of the weapon in its immediate post-accident condition.

107.    However, rather than seeking to learn the real facts and details surrounding the dangerous propensity of the P320 firearm to fire un-commanded, SIG's upper-level management actively avoided learning the details of defective discharge events. It instead worked, where possible, with some law enforcement departments to theorize implausible reasons why P320s were discharging without trigger pulls, including that "keys," "artifacts," "seatbelt buckles," and "clothing articles", among others, were getting into the holsters and pulling the triggers.

108.    In one email exchange, for example between a SIG in-house lawyer and a Roscommon, Michigan, law enforcement agent in 2016, the SIG lawyer recounts a patrol officer stating on a body cam video (after a defective discharge inside a patrol car): "[T]ell me how a gun would fire still in the holster." The lawyer also states in the email that he told a sergeant of the Roscommon Department that he "did not want to see anything they did not want me to see.".

109.    After relating in the email that the P320 at issue discharged simply when the officer "started to stand" to get out of his car, SIG's in-house lawyer noted that the empty casing of the discharged round had not ejected, as it should have.

110.    The contradictions between SIG's public representations that the P320 was safe, and its private knowledge that it was not, showed a conscious disregard for the lives and safety of 15 members of the public and law enforcement officers. At all times relevant to this Complaint, SIG employed a skillful public relations campaign, internet marketing, and in-person reassurances of the P320's alleged safety to end users, which was designed to maximize revenue at the expense of human safety.

111.    Upon information and belief, it is standard operating procedure for all Puerto Rico Police, U.S. law enforcement agencies, including the United States Secret Service, the Federal Bureau

of Investigation, the Bureau of Alcohol, Tobacco, Firearms and Explosives, as well as local and state

police departments, to carry pistols with a chambered round. SIG was fully aware of this fact at the

time it sold any and all P320 pistols to the public and to government-based law enforcement agencies

and departments, including the PRPB.

112.    As a matter of fact, the agents for the Puerto Rico Police Bureau MUST carry their

P320 with a chambered round at all times, subject to severe sanctions from the bureau.

113.     It is widespread practice among civilians who conceal carrying their pistols to have a

round in the chamber. This practice does not violate black letter rules of firearm safety, as pistols

should not be vulnerable to un-commanded discharges under any circumstances.

114.    SIG was aware of the facts described in previous paragraphs of this complaint, when it

designed and manufactured the P320 in 2014 or earlier and left the pistol in the market, knowingly

selling the product to the public (and the Puerto Rico Police Bureau) patent foreseeable and potential

situation of a critical uncommand discharge.

115.    Other Substantially Similar or Identical Defective Discharges of the P320, such as

before it introduced the P320 into the stream of commerce in the United States in 2014, SIG was

aware of defective discharges without a trigger pull, many of which pre-dated the date of assignment

of the pistol to Ricardo in 2018.

116.    Upon information and belief, there have been many prior incidents of defective

discharges involving the P320 that have discharged without the trigger being pulled (whether

involving the P320 in its original configuration, or the re-designed or "upgraded" version). The P320

has defectively discharged (both while in battery and out-of-battery) while the weapon was merely

being handled, moved, while it was being holstered or un-holstered, and when the weapon was

accidentally dropped.

117.    On August 8, 2017, SIG's CEO released a statement stating: "there have been zero (0)

reported drop-related P320 incidents in the U.S. Commercial market." This statement was false, in

view of SIG's knowledge that Officer Sheperis in Connecticut had been shot by a drop fire some eight months earlier with the commercial version of the P320, and that several other accidental discharges of the P320 had occurred before that date.

118.    On August 8, 2017, SIG announced a "voluntary upgrade" program for the P320 pistol, stating that the pistol meets "rigorous testing protocols for global military and law enforcement agencies." The upgrade program, which was presented to the public as purely optional, not urgent, and not mandatory, offered to make existing commercial versions of the P320 "better" by installing a much lighter trigger, and internal disconnect switch, and an improved sear to prevent accidental discharges.

119.    On August 9, 2017, the police chief of Morrow, Georgia issued an emergency order removing the P320 from service.

120.    On August 16, 2017, the Dallas Police Department issued a recall of the P320 due to drop safety concerns, prohibiting its use by officers until repaired. In an interdepartmental memo, it stated: Sig Sauer has identified that there is a defect in the P320 handgun that could cause the weapon system to go off when dropped. The Sig Sauer P320 was approved for primary duty, secondary primary duty, and back-up use. The Firearms Training Center is currently working with Sig Sauer to obtain a solution for the safety issue. Until Sig Sauer is able to find a solution to the safety issue, the Sig Sauer P320 is no longer approved by the Dallas Police Department for any use.

121.    Upon information and belief, employees at Sig Sauer's own training academy in New Hampshire have admitted to accidental discharges causing injury in both 2016 and 2017. To date, SIG has never issued a mandatory recall of the P320 for repairs, though it has done so in the past for other of its products.

122.    Since the P320 was delivered to the Puerto Rico Police Bureau there have been 62 critical discharges in this jurisdiction (First Circuit) specifically in the Puerto Rico District, which was known by Defendant.

123.    The Puerto Rico Police Bureau delivered a certification that stated a report in which 68 P320 pistols have been returned due to critical discharges or investigation.

124.    Other events in other jurisdictions, for example, known by Defendant prior to the incident in the instant Complaint, include:

125.    From 2005 to January 2011, the San Francisco Police Department reported 29 accidental discharges (a time when it issued SIG Sauers as its primary sidearm).

126.    In 2008, an officer in Connecticut accidentally discharged his SIG Sauer while holstering it.

127.    In 2011, a security guard in St. Louis dropped his SIG Sauer, unintentionally shooting someone.

128.    n 2012, a New York transit officer accidentally discharged his SIG Sauer while holstering it.

129.    In 2014, a federal air marshal in New Jersey unintentionally shot himself while handling his SIG Sauer service weapon.

130.    In 2015, a Pennsylvania state trooper and firearms instructor accidentally killed another trooper with his SIG Sauer while conducting safety training.

131.    In 2016, a tactical response training instructor near Sacramento dropped his SIG Sauer, firing a bullet into a student's truck.

132.    In the period between 2012 and 2015, the New York City Police Department reported 10 accidental discharges involving Sig Sauer weapons.

133.    On January 5, 2017, a P320 shot a Stamford SWAT team member in his left knee when the pistol fell from a distance of less than three feet to the ground while fully holstered, refuting SIG's express representations that the weapon is drop safe and does not require a safety to be drop safe.

134.    On February 28, 2017, a P320 accidentally discharged while in use by the University of Cincinnati Police Department.

135.    On June 14, 2017, a P320 accidentally discharged in Wilsonville, Oregon.

136.    On June 20, 2017, a P320 accidentally discharged while in use by the Howell Township, NJ Police Department. 41. In June of 2017, SIG shipped approximately 800 P320s to the Loudoun County Sheriff's Department, privately assuring its leadership that the problems with the weapon would be fixed, but that "for now," it had to deal with the weapon as currently manufactured and designed.

137.    On July 28, 2017, a P320 accidentally discharged in Tarrant County, Texas.

138.    On August 4, 2017, a Stamford SWAT team member sued SIG in U.S. District Court in Connecticut for an accidental discharge of a commercial version of the P320 which shot him in his knee.

139.    On August 8, 2017, SIG's CEO released a statement stating: "there have been zero (0) reported drop-related P320 incidents in the U.S. Commercial market." This was statement was false, in view of SIG's knowledge that Officer Sheperis in Connecticut had been shot by a drop fire some eight months earlier with the commercial version of the P320, and that several other accidental discharges of the P320 had occurred before that date.

140.    On August 8, 2017, SIG announced a "voluntary upgrade" program for the P320 pistol, stating that the pistol meets "rigorous testing protocols for global military and law enforcement agencies."

141.    In February of 2016, a fully-holstered P320 discharged without a trigger pull inside a Roscommon, Michigan police officer's vehicle when the officer moved to exit the vehicle during a snowstorm. The incident was captured on the officer's body cam video and shows that no object entered his holster at any time.

142.    In 2016, the Surprise, Arizona, police department complained to SIG of two separate incidents of P320s firing without trigger pulls.

143.    On February 7, 2018, Loudoun County, Virginia, deputy sheriff Marcie Vadnais's P320 fired on her un-commanded severing her right femur causing catastrophic skeletal injury, deformity, four general anesthesia surgeries, severe emotional distress, and related trauma, ending her career. Upon CAT scanning her P320, it was found to have both a product and manufacturing defect: crossed sear springs that apply upward spring pressure to the sear to keep it from releasing the striker. As previously indicated in this case Plaintiffs prevailed in 2024 with a Jury Verdict in his favor.

144.    In 2017, a sheriff's deputy in Michigan accidentally discharged a SIG Sauer pistol, striking a schoolteacher in the neck.

145.    On July 28, 2017, a P320 accidentally discharged in Tarrant County, Texas.

146.    On August 7, 2017, SIG's CEO, Ron Cohen, stated in a press release that: "there have been zero (0) reported drop-related P320 incidents in the U.S. Commercial market." This statement was not true. In fact, at the time it was issued, SIG had direct knowledge that Officer Vincent Sheperis in Connecticut had been shot by a drop fire with the commercial version of the P320 approximately eight months earlier, as well as several other defective discharges of the P320 before that date.

147.    As noted, on August 8, 2017, SIG announced a "voluntary upgrade" program for the P320 pistol, stating that the pistol meets "rigorous testing protocols for global military and law enforcement agencies" and all "U.S. standards for safety."

148.    This statement was also false and intentionally misleading as there are no United States federal government standards for gun safety, a fact well known to SIG when it issued this press release.

149.    SIG's VU program, as noted, was presented to the public as purely optional, not urgent, and not mandatory, offering to make existing commercial versions of the P320 "better" by installing a much lighter trigger, an internal disconnector component, and an improved sear to prevent accidental discharges.

150.    On August 9, 2017, the police chief of Morrow, Georgia, issued an emergency order removing the P320 from service.

151.    In October of 2017, a P320 was alleged to have accidentally discharged in Georgia when an officer fell to the ground in pursuit of a suspect. His weapon was holstered and fired simply when he struck the ground, which was known by defendant.

152.    On November 12, 2017, a P320 was alleged to have accidentally discharged in Tyler, Texas, which was known by defendants.

153.    In January 2018, upon information and belief, a P320 accidentally discharged in Dallas County, Texas, which was known by defendant.

154.    Months later in April of 2018, SIG issued a second "voluntary upgrade" notice to all users or owners of the P320 but still did not recall the weapon.

155.    In May of 2018, civilian Gunter Walker reported to SIG that his P320 fired on him un-commanded when he placed the weapon down on his nightstand, shooting him through the palm of his left hand, which was known by defendant.

156.    In June of 2018, a Williams County, Ohio, officer reported that his P320 discharged twice in one moment as he was merely attempting to move the slide backward. One round grazed the officer's arm; the other blew through his patrol car's driver's side door, which was known by defendant.

157.    In May 2018, a Rancho Cucamonga, California, an officer reported that his "upgraded" P320 fired un-commanded while he was merely walking inside his department locker room; the casing of the round did not eject, which was known by defendant.

158.    In October of 2018, a P320 allegedly fired un-commanded on Lieutenant Letrell Hayes in Georgia while he was holstering it, causing severe tunneling injuries to his right thigh and calf, which was known by defendant.

159.    In October of 2018, firearms expert and retired law enforcement officer Stephen Mayes alleged that his P320 fired on him un-commanded while seated in its holster, causing severe injury to his right leg, which was known by defendant.

160.    In December of 2018, civilian Robert Lang's P320 allegedly fired on him un-commanded, causing severe tunneling wounds to his right leg, which was known by defendant.

161.    On May 19, 2019, the upgraded P320 of Lieutenant Thomas Ahern of the Cambridge, Massachusetts, SWAT team fired un-commanded inside a SWAT van with six other occupants while he was working a shift for the annual Mayfair event near Harvard Square, which was known by defendant.  The round struck a metal plate affixed to his cellphone case, deflected into a SWAT gear bag, and came to rest in a ballistic helmet, narrowly missing everyone. The casing of the round did not eject. Lieutenant Ahern is a SIG-certified armorer on the P320 with significant weapons experience.

162.    On July 23, 2019, an upgraded P320 fired un-commanded on Officer Walter Collette, Jr. of the Somerville, Massachusetts, police department, hitting him in his leg and causing substantial injuries to his leg. The next day, an upgraded P320 fired un-commanded on a Homeland Security Agent at a firing range in the Bronx, New York, which was known by defendant.

163.    In August of 2019, a Philadelphia transit officer's upgraded P320 fired un-commanded while fully-holstered, nearly striking a bystander in the subway. The incident was captured on video, it shows an "upgraded" P320 firing without the gun ever being touched and seated inside its holster. The officer involved, who noted that the round almost hit a bystander, was returned to duty the next day fully exonerated and with no discipline.

164.    The Philadelphia transit authority replaced all SIG P320s, and later fully exonerated the officer of any alleged wrongdoing in view of the content of the videotape of the incident

showing that it fired without a trigger pull. The officer, Craig Jacklyn, later stated: "This weapon is a hazard. I actually spoke with a lawyer for my situation. Although no one was hurt...someone could have been killed. I'm angry that I was put in a potentially life altering position with a product deemed "safe" by its manufacturer. The fact that officers are carrying this weapon on the job and at home around family thinking it's safe even while resting in its holster has me very angry. Everything that I've told you is documented through 2 Investigative Services . . . Philadelphia Police Firearms Investigative Unit/ Officer Involved Shooting Incident Unit and SEPTA Transit Police Criminal Investigations Unit. There is station video footage/ body worn camera footage as well."

165.    On September 3, 2019, another upgraded and re-designed P320 in use by the Loudoun County, Virginia, sheriff's office alleged that it fired un-commanded on another Loudoun County deputy sheriff, Carl Costello, hitting him in his leg, which was known by defendant.

166.    On October 10, 2019, Officer Jacques Desrosiers, also of the Cambridge, Massachusetts, police department, alleged that he was shot by his P320 without a trigger pull, which was known by defendant. The round caused massive and life-changing injuries to Officer Desrosiers. The spent casing of the round did not eject.

167.    On October 11, 2019, a P320 was alleged to fired un-commanded on Veterans Affairs police officer Frank J. Kneski, striking him beneath his lower back as he was un-holstering the weapon. Upon inspection it was found that the spent casing did not eject, which was known by defendant. The Kneski discharge was investigated by Major Peter J. Villani of the United States Veterans Affairs police agency, also a SIG-certified armorer. In his report, he noted the following: After reviewing the Officer's sidearm, it was noted that the P-320 came from Sig Sauer to the distributor prior to the point of sale already with the "upgrade" completed. The sidearm had approximately 100 rounds through it since

purchased. Upon further examination of the internal parts of the frame module, I noticed that the foot of the striker that catches the [sear] has noticeable side to side and up and down movement within its channel along with upward movement of the slide from the frame. Also, the edge of the striker foot which has a height thickness of approximately 2mm, is only making contact with approximately .25 of a mm of the leading edge only of the disconnector hook. Since the striker has been changed with a lighter weight version during the "upgrade program", it is quite possible that any abrupt movement or twisting of the P-320 while holstered, could cause the foot of the striker to disengage itself from the disconnector hook on its own since there is so little contact between the striker foot and the [sear].

168.    On November 9, 2019, a P320 was alleged to have fired un-commanded on Officer Matthew Gardette of the Manteca, California police department as he was getting ready for work, which was known by defendant.   As he merely attempted to place and fasten his duty belt around his waist, the P320 discharged inside the holster. The holster was a Safariland level three holster with the hood cover up securing the pistol. The round blew out the bottom of the holster, impacted the locker room floor, and missed both Officer Gardette and a fellow officer by inches as it ricocheted into a locker door.

169.    On December 2, 2019, a P320 was alleged to have fired un-commanded while in the possession of Detective David Albert, also of the Cambridge, Massachusetts, police department, as he was in the process of putting his duty belt on, which was known by defendant.

170.    In June of 2020, it was alleged that a P320 fired un-commanded on a Pasco County, Florida officer, severely wounding him in his right leg. This incident was the third un-commanded discharge experienced by Pasco County officers since 2019, which was known by defendant.

171.    In June of 2020, it was alleged that a P320 fired un-commanded on a civilian in Missouri while fully seated in its holster, causing substantial damage to the holster and resulting in a broken bone to the civilian's foot, which was known by defendant.

172.    Upon information and belief, aside from top executives of SIG, employees at SIG's own training academy in New Hampshire have knowledge of defective discharges causing injury that occurred in both 2016 and 2017.

173.    In an interview in 2013, just before the P320 came to market, SIG's former Chief Financial Officer, Timothy Scullin, noted that SIG's revenue had risen approximately 1,400 percent from 2012 to 2013. He further stated that Sig Sauer's growth had outpaced the firearms' industry's growth by "two or three times." When asked what were some of the biggest professional challenges in his career with SIG, CFO Scullin stated: At SIG, to grow this fast, people get really challenged. When you're growing 70 to 80 percent in a year, all the systems get stretched, and the people really get stretched. You have to be able to manage multiple tasks in a very fast environment, and in an environment that's highly regulated, so you can't mess up, otherwise you get shut down. It just creates a tremendous amount of stress on the people in the system. But we've got people that have risen to the challenge.

174.    Upon information and belief, the "stress" Scullin noted on SIG's employees included verbal and even physical harassment to get product "out the door" as quickly as possible regardless of quality control and safety concerns.

175.    Instead of disclosing its safety defects in numerous marketing materials – or on the packaging of the P320 – Sig decided to conceal and hide them from users such as Ricardo, causing them and him to carry and use the P320 when he otherwise would not have.

31

## COUNT VI

### INFLICTION OF EMOTIONAL DISTRESS UPON CO-PLAINTIFFS

**JOHANNA JEREZ REYES (WIFE); NATALIE ORTIZ JEREZ (DAUGHTER)**

176.    Ricardo, and the other Plaintiffs readopt and re-allege all the preceding paragraphs of this Complaint as if fully set forth herein.

177.    The Family of Ricardo, wife, and daughter, have all suffered mental and emotional damage because of the incident upon Ricardo.

178.    His wife and his daughter sons suffered emotionally after the incident, worried about the health of Ricardo, not only by the injuries at the moment of the incident but also during the medical treatment and his further imposed use of the P320 with a bullet in the chamber to be carried holstered for work.

179.    Defendant's negligent acts and/or defective product, contributed to Co-Plaintiffs JOHANNA JEREZ REYES (WIFE) AND NATALIE ORTIZ JEREZ (DAUGHTER) emotional damage and distress; due to Ricardo's physical injuries and his consequential emotional distress which could have been and was foreseeable.

180.    As a direct and proximate result of the breaches by Defendant set forth in this Complaint, all of Ricardo's sufferings were also shared by his family, the Co-Plaintiffs, suffering mental anguish, inconvenience due to Ricardo's loss of the capacity for the enjoyment of life, loss of consortium by Johanna, helping Ricardo, nursing, life care expenses for care and treatment.

181.    Johanna suffered temporary loss of consortium, mental anguish seen his husband suffering, mental stress due to Ricardo's complaints of pain, forced to stay at home to nurse him and take care of him, as well as being deprived of many hours of peace and sleep taking care of Ricardo.

182.   Ricardo's daughter has suffered seem his father in such distress, not being able to share the usual time with him and crying for his father's suffering. Also, moments of displacement with his father, enjoyment of precious time in family activities, vacations, quality family time and love sharing.

183.   For the Negligent Infliction of Emotional Distress suffered by Plaintiffs JOHANNA JEREZ REYES (WIFE) in a sum not less than THREE HUNDRED THOUSAND DOLLARS ($300,000.00); AND NATALIE ORTIZ JEREZ (DAUGHTER) in a sum not less than ONE HUNDRED THOUSAND DOLLARS ($100,000.00), defendants are liable and responsible, *in solido*.

## COUNT VII
### (Attorney's Fees, Costs, Expenses and legal Interest)

184.   The plaintiff reproduces and reaffirms, as if alleged herein, each and every one of the preceding allegations.

185.   Plaintiff is entitled to Attorney fees, expenses and legal interest.

186.   Pursuant to the laws of the Commonwealth of Puerto Rico, a person who is obstinate in fomenting litigation and/or protracting litigation, or refusing to recognize an obligation, is liable for reasonable attorney's fees.

187.   Pursuant to the laws of the Commonwealth of Puerto Rico, a person who is adjudged obstinate is also liable for pre-judgment interest from the date of the filing of the claim.

188.   The defendants have been obstinate in that, although they have been on notice of the nature and extent of the damage suffered by the plaintiffs, they have taken no action on the matter and have, in fact, fomented this litigation.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that after a Trial by Jury, that this Court enters Judgment in favor of Plaintiff, with a verdict that:

1. Finds Defendant liable for defective manufacturing and design of the product (Sig Sauer P320).

2. Awards Plaintiff Ricardo Ortiz Perez compensatory damages, including but not limited to damages for physical injury, pain and suffering, infliction of emotional distress, humiliation, inconvenience and loss of enjoyment of life, in total amount of $4,500,000.00 dollars.

3. An order directing Defendants to pay Plaintiff, a sum in the amount to be determined by the Jury after a jury instruction, as punitive damages, based on the intentional and willful omissions after having privity of knowledge.

4. Award the Co-plaintiff, Johanna Jerez Reyes (Wife), compensation for damages of emotional Distress in the sum of THREE HUNDRED THOUSAND DOLLARS ($300,000.00); and compensation for damages of emotional Distress Co-plaintiff Natalie Ortiz Jerez (DAUGHTER) in a sum not less than ONE HUNDRED THOUSAND DOLLARS ($100,000.00).

6. Award plaintiff reasonable attorneys' fees, costs and expenses, and the applicable legal interest.

7. Award such other relief as the Court deems appropriate.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 8TH day of August 2025.

| /S/   JOSÉ VLADIMIR DÍAZ-TEJERA | /S/ RICARDO IZURIETA-ORTEGA |
|---|---|
| José Vladimir Díaz-Tejera<br>USDC-PR 208604<br>PO Box 423<br>Trujillo Alto, P.R. 00977<br>Tel 787-755-3440<br>Email: diaz_tejera_lawfirm@yahoo.com | USDC-PR  124205<br>Urb. Crown Hills<br>Ave. Winston Churchill, PMB 914<br>San Juan, P.R. 0026<br>Tel. (787) 531-9419<br>E-mail:  izurieta.ricardo@gmail.com |